NATIONAL NEWARK & ESSEX BANK, *ET AL.*, PLAINTIFFS-APPELLANTS, v. HOUSING AUTHORITY OF THE CITY OF NEWARK, DEFENDANT-RESPONDENT, AND NEWARK INDUSTRIAL DEVELOPMENT CORPORATION, *ET AL.*, DEFENDANTS.

Argued January 9, 1978—Decided March 23, 1978.

Mr. *H. Lee Sarokin* argued the cause for plaintiffs-appellants (*Messrs. Lasser, Lasser, Sarokin and Hochman*, attorneys; *Mr. Sarokin* of counsel; *Mr. Richard L. Zucker*, on the petition).

Mr. *Ferdinand J. Biunn*o argued the cause for defendant-respondent Housing Authority of the City of Newark (*Mr. Steven C. Rother,* attorney; *Ms. Lauren B. Cohen,* on the brief).

The opinion of the court was delivered by

SULLIVAN, J. Plaintiffs real estate brokers[1] sued to recover commissions allegedly due on the sale of lands by defendant Newark Housing Authority of the City of Newark (Housing Authority) to defendant Ideal Toy Corporation (Ideal). Also sued by plaintiffs were the City of Newark and the Newark Industrial Development Corporation (NIDC). Defendant Housing Authority cross-claimed against Ideal, the City of Newark and NIDC for indemnification should it be held liable for the commissions. At the conclusion of a non-jury trial plaintiffs' claims against Ideal, the City of Newark and NIDC were dismissed, as were defendant Housing Authority's cross-claims against these same defendants for indemnification.

Thereafter, the trial court, by letter opinion, dismissed the suit against defendant Housing Authority basically on the ground that, at best, plaintiffs' claim for a broker's commission was barred by the second paragraph of Section 9 of the Statute of Frauds, *N. J. S. A.* 25:1-9. This provision states that a broker selling real estate pursuant to an *oral* agreement with the owner, who actually effects such sale before the oral agreement is repudiated or terminated by the owner, may recover the amount of commission on such sale, if the broker shall, within five days after the making of the oral agreement and prior to the sale, serve upon the owner a notice in writing setting forth the terms of the oral agreement and the rate or amount of commission to be paid.

---

[1] Plaintiffs National Newark & Essex Bank and Samuel Rubinson are the executors of the Estate of David W. Settle, one of the real estate brokers, now deceased.

The court held that letters written by plaintiffs to the Housing Authority on March 1, 1967, March 14, 1968 and February 9, 1970 reminding the Housing Authority of their status as brokers and their right to a commission (the contract of sale between the Housing Authority and a subsidiary of Ideal Toy was entered into on August 12, 1970) did not satisfy the statutory requirements.

Plaintiffs' contention that the Statute of Frauds was inapplicable because the Housing Authority was not the owner of the property at the time, was rejected by the court since the record showed that a sizable portion of the land had already been acquired by the Housing Authority in 1965 and 1966.

Plaintiffs filed an appeal from the judgment in favor of the Housing Authority. (They did not appeal from the dismissals as to the other defendants.) The Housing Authority filed a separate appeal from the dismissal of its cross-claim for indemnification against these other defendants. The two appeals were consolidated for argument by the Appellate Division which affirmed the ruling in favor of the Housing Authority essentially for the reasons given by the trial court. Plaintiffs' additional claim that the Housing Authority by its conduct was estopped from asserting the Statute of Frauds as a defense was found to be without any factual basis. Since it upheld the trial court's dismissal of plaintiffs' claim against the Housing Authority, the Appellate Division did not reach the issues presented by the Housing Authority's appeal. Plaintiffs filed a Petition for Certification which this Court granted. 72 *N. J.* 467 (1976).

For reasons hereinafter set forth, we conclude that plaintiffs' claim is not limited to an *oral* agreement between broker and seller so that the second paragraph of Section 9 of the Statute of Frauds, relied on by the trial court in dismissing plaintiffs' claim, is inapplicable. Instead, we find that plaintiffs' proofs substantially satisfied the requirements of the first paragraph of Section 9 that plaintiffs' au-

thority to act as brokers be in writing signed by the Housing Authority or its authorized agent, which writing shall set forth the rate of commission. Plaintiffs therefore, are entitled to judgment against the Housing Authority for commissions due on the sale in question.

The relevant portions of Section 9 of the Statute of Frauds, *N. J. S. A.* 25:1-9, provide:

Except as herein otherwise provided, no broker or real estate agent selling or exchanging real estate for or on account of the owner shall be entitled to any commission for such sale or exchange, unless his authority therefor is in writing, signed by the owner or his authorized agent, or unless such authority is recognized in a writing or memorandum, signed by the owner or his authorized agent, either before or after such sale or exchange has been effected, and, in either case, the rate of commission on the dollar or the amount of the commission shall have been stated therein.

Any broker or real estate agent selling or exchanging real estate pursuant to an oral agreement with the owner of such real estate, who shall actually effect such sale or exchange before such oral agreement shall have been repudiated or terminated by the owner in writing as hereinafter provided, may recover from such owner the amount of commission on such sale or exchange, if the broker or agent shall, within five days after the making of the oral agreement and prior to the actual sale or exchange of such real estate, serve upon the owner a notice in writing, setting forth the terms of the oral agreement and stating the rate or amount of commission to be paid thereunder, and if the owner shall not have repudiated or terminated the oral agreement prior to the actual sale or exchange of the real estate.

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

The basic and controlling facts are undisputed. In 1949 the City of Newark, by ordinance, authorized the Housing Authority of the City of Newark to initiate and carry out redevelopment projects within the City. The Newark Industrial Development Corporation, a non-profit corporation, was formed in 1965 through the auspices of the Newark Chamber of Commerce to promote industrial and commercial growth in the City of Newark. Following incorporation of NIDC, the City of Newark designated NIDC as its agency for industrial and commercial development and redevelopment in

the City of Newark. This agency drafted and filed a proposal for redevelopment of the Industrial River Urban Renewal Project (Project NJR–121) the area of which had previously been declared blighted.

On June 15, 1965 the Housing Authority and NIDC entered into an agreement for the development of Project NJR–121 in accordance with the Urban Renewal Plan adopted by the City for this project. Under the agreement, which was conditioned on the Housing Authority obtaining the necessary funding, the Housing Authority was to acquire the lands in the project, clear the same, and install, construct or reconstruct streets, utilities and site improvements in preparation for the resale of such land for private redevelopment. The function of NIDC was to promote the project and to interest business and industry in locating there. Plaintiffs' claim for a brokerage commission is for the sale of land lying wholly within this area.

In 1964 plaintiffs became aware that Ideal, then located in New York, was seeking a new plant site for its expanded program and undertook to find one that would satisfy Ideal's needs. The possible availability of a site in project NJR–121 first came to plaintiffs' attention in or around the spring or summer of 1965 through brochures and advertisements of NIDC promoting the development. This material invited real estate broker participation and much of it carried the legend "brokers protected."

Plaintiffs, after considerable investigation, research and planning, interested Ideal in possibly locating in the Newark development. In furtherance of this interest, plaintiffs, in the spring of 1966, were able to schedule a meeting in the office of the Mayor of Newark attended by the Mayor, plaintiffs and representatives of Ideal. The prospect of a large corporation coming to Newark, which would employ thousands of people, was well received. Arrangements were made by the Mayor personally to have NIDC pursue the matter. In turn, NIDC brought the Housing Authority into the discussions.

Extended negotiations over a period of years were had between Ideal, NIDC and the Housing Authority, which in 1965 and 1966 had acquired title to substantially all of the land in question. Negotiations between the parties continued to a point where on September 22, 1966 Ideal sent a letter of intent to NIDC indicating their interest in and offering to purchase certain property in the project area comprising 100 acres at $33,000 per acre. One of the plaintiff-brokers assisted in the preparation of this document.

On March 1, 1967, plaintiffs, anticipating that a contract of sale was going to be entered into between Ideal and the Housing Authority, wrote to the Housing Authority. They reminded it that plaintiffs had produced Ideal as a purchaser and that if the sale was consummated, plaintiffs would expect to receive a commission on the sale at the rates of commission fixed by the Newark Real Estate Board. Two additional letters of a similar nature and content were sent to the Housing Authority on March 14, 1968 and February 9, 1970, on behalf of plaintiffs by their attorney. The Housing Authority did not formally respond to these letters.[2]

As heretofore noted, a formal contract of sale dated August 12, 1970 was entered into between the Housing Authority and a subsidiary of Ideal for the sale and purchase of approximately 100 acres of land in the NJR–121 project at a price of $33,000 per acre. On September 13, 1972, 39.93 acres of land within the project area were conveyed by the Housing Authority to Ideal.

Considering the foregoing undisputed facts, we conclude that the trial court and the Appellate Division erred in holding that plaintiffs' claim for a real estate brokers' commission was, at most, based on an *oral* agreement between plaintiffs and the Housing Authority. NIDC, acting as the agent for

---

[2]The Housing Authority does not acknowledge that it received the March 1, 1967 letter.

the Housing Authority and in its capacity as promoter of Project NJR–121, had extensively advertised the availability of choice plant sites in the project area and had invited real estate broker participation. These advertisements carried the phrase "brokers protected." Martin M. Lehrer, one of the plaintiffs, testified that this is a term of art used in advertising sales of real estate and that it has a common and accepted meaning in the real estate industry that the seller will pay a commission at the established rate to any broker who produces a buyer.[3]

This evidence was not seriously challenged by the Housing Authority, its basic contentions being (1) that NIDC had no authority to obligate it to pay brokers' commissions and (2) that while the Housing Authority was aware of plaintiffs' presence in the initial negotiations with Ideal, it was not put on notice that plaintiffs would look to it for payment of a brokers' commission if a sale was consummated. However, Louis Danzig, who was Executive Director of the Housing Authority and who was a defense witness, testified that on October 24, 1966, as part of the promotional efforts for the project, he spoke at a meeting of industrial realtors of the City of Newark and encouraged them to become interested in the industrial development of the Newark meadows and told them that the Housing Authority could and would pay commissions to brokers if they produced buyers.[4] This confirmation of the "brokers protected" advertisements by the Housing Authority's promotional agent is significant. In combination, there was an offer in writing, authorized

---

[3]Defendant Housing Authority concedes that the prevailing rate of commission on the sale of vacant land, as published by the Real Estate Board of the State of New Jersey in the Realtors Handbook, was 10%.

[4]This meeting was attended by plaintiff Martin M. Lehrer who also testified as to Danzig's assurances that the Housing Authority would pay a commission to any broker who produced a buyer in the meadowland area.

by the Housing Authority, which was acted on and accepted by plaintiffs when they produced a buyer.

The offer invited acceptance by performance. 1 *Williston, Contracts* (3 ed. 1957), § 65 at 212; see *Ass'n Group Life, Inc. v. Catholic War Veterans,* 120 *N. J. Super.* 85, 95 (App. Div. 1971), modified (for other reasons) 61 *N. J.* 150 (1972). Coupled with the Danzig testimony and the lack of any real dispute as to the meaning of the term "brokers protected," including the applicable rate of commission, these advertisements satisfied the requirements of the first paragraph of Section 9 of the Statute of Frauds that the authority of a broker selling real estate for an owner be in writing signed by the owner or his authorized agent and state the rate or amount of commission.[5] The policy of the Statute of Frauds against claims for real estate brokers' commissions based on oral agreements is not offended by our decision herein, which is founded upon undenied written manifestations of authority vested in the broker.

It is also significant that the letters written to the Housing Authority by or on behalf of plaintiffs confirming their production of Ideal as a buyer and their status as brokers in the matter were never formally rejected or challenged by the Housing Authority even though all three letters antedated the actual contract of sale to Ideal, some of them by more than two years.

This was not the case of a broker injecting himself into ongoing negotiations between a seller and a prospective buyer. It is conceded by the Housing Authority that, in fact, plaintiffs were the ones who interested Ideal in locating in the Newark project and actually produced Ideal as a purchaser and, as found by the trial court, "to this day" Ideal admits that plaintiffs introduced them to Newark and the meadowland property.

---

[5] To the extent that the holdings in *Hueth v. Stevenson,* 100 *N. J. L.* 1 (Sup. Ct. 1924) and similar cases are to the contrary, they are disapproved.

· [1]· Plaintiffs by· their performance satisfied the terms of the written offer made by or on behalf of the Housing Authority and are entitled to a commission on the sale to Ideal at the 10% rate. However, since the record does not fully disclose the amount of land actually conveyed to Ideal under the contract of sale, the matter must be remanded to the trial court for such hearing as may be necessary to determine the amount of land actually purchased by Ideal and plaintiffs' commission on such sale.

Since we find the Housing Authority to be liable to plaintiffs for a commission, it becomes necessary to consider its appeal from the dismissal of its cross-claims for indemnification.

The trial court dismissed the cross-claims against the City of Newark, NIDC and Ideal essentially for the same reasons given for dismissing plaintiffs' claim against these defendants. The City of Newark, it held, had assumed no obligation to plaintiffs and breached no duty to them. While Newark had rendered its cooperation and assistance in locating Ideal in Newark, it found that the Housing Authority was acting on its own as a separate autonomous agency and that the City of Newark had no vicarious responsibility. As to NIDC, the trial court found it to be a voluntary public relations agency without any operating budget and that while it functioned as agent for the Housing Authority for the purpose of attracting industry to Newark, there was no basis for obligating it to pay a commission.

We agree with the trial court's evaluation and disposition of the cross-claims against the City of Newark and NIDC. As to the latter defendant it should also be noted that while NIDC was the agency which placed the advertisements "brokers protected," it did so as agent for the Housing Authority. That in so doing it was acting within the scope of its agency was confirmed by the executive director of the Housing Authority who unequivocally stated that the Au-

thority could and would pay commissions to brokers if they produced buyers in the project under development.

As to Ideal, the Housing Authority in the brief filed as appellant in the Appellate Division asserted that Ideal was guilty of tortious interference with plaintiffs' opportunity to earn a brokerage commission and of wrongfully withholding from the Housing Authority its agreement with plaintiffs that plaintiffs would not look to Ideal for payment of commissions and Ideal would protect plaintiffs in their claim against the Housing Authority.

The grounds asserted in support of the cross-claim against Ideal are frivolous. The trial court found that there had been no tortious interference by Ideal and that "to this day" Ideal admits that plaintiffs introduced them to Newark and the meadowland property. Ideal's witnesses also unequivocally testified that there never was an agreement to "protect" plaintiffs in their claim against the Housing Authority. Plaintiffs' letters to the Housing Authority, heretofore referred to, refute the Authority's contention that there was concealed from it plaintiffs' intention to claim a commission from the seller. The trial court acted correctly in dismissing the Housing Authority's cross-claim for indemnification.

The judgment of the Appellate Division is reversed and the case remanded to the trial court for further proceedings in accordance with this opinion.

*For reversal and remandment*—Chief Justice HUGHES, Justices SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER and HANDLER and Judge CONFORD—7.

*For affirmance*—None.